UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x
ORLANDO MASAGUILAR,

                Petitioner,

        -against-

MARK BRADT, Superintendent,

                Respondent.
-----------------------------------------------------x
DEARIE, District Judge.

**MEMORANDUM & ORDER**

12 CV 3052 (RJD)

      Following a jury trial at which he testified in his own defense, petitioner Orlando

Masaguilar was convicted of attempted murder in the second degree, assault in the first degree,

menacing in the second degree, criminal possession of a weapon in the second degree, criminal

use of a firearm in the first degree, and criminal possession of a controlled substance in the

fourth degree. He was sentenced as a prior violent felony offender to concurrent 25-year terms

on the attempted murder, assault and weapons counts, and received an additional nine-year term,

to be served consecutively, on the drug possession count. The principal charges arose out of a

shooting that occurred during the early hours of Christmas morning outside a delicatessen in

Uniondale that was hosting a holiday party. The separate charge of drug possession is based on

the discovery of a packet of cocaine inside each of petitioner's socks at the time of his arrest two

days later.

      Following affirmance of petitioner's conviction by the Appellate Division, Second

Department, which found the evidence of his guilt to be "overwhelming," People v. Masaguilar,

86 A.D.3d 619, 620 (2d Dep't 2011), lv. app. denied, 17 N.Y.3d 904 (Oct. 4, 2011), petitioner

now seeks federal habeas relief pursuant to 28 U.S.C. § 2254.  He claims: (i) that certain of the prosecutor's cross-examination questions and summation remarks brought undue emphasis to petitioner's criminal record and other uncharged criminal conduct and thereby rendered his trial fundamentally unfair (separate grounds in the petition treated together here); (ii) that the denial of petitioner's motion to sever the drug possession count from the shooting-related charges was improper and rendered his trial unfair; and (iii) that defense counsel was ineffective in not addressing the alleged prosecutorial infractions.

For the reasons set forth below, the application for habeas relief is denied and the petition dismissed.

## BACKGROUND

**A.**    **Trial**

The principal prosecution witness was the victim of the shooting, Manuel Medrano, who survived and identified petitioner as the man who shot him.  (Trial Transcript, ECF No. 7 ("TT") at 132-150).  Shortly after midnight, on December 25, 2007, Medrano arrived at the Vista Alegre Delicatessen in Uniondale for a holiday party.  He quickly encountered a man he knew as "Adillio" and noticed that his face was bruised.  Adillio explained to Medrano that the bruises were the result of a fight he had had with petitioner earlier in the evening.  Medrano then left Adillio and went downstairs to the party.  There, he saw a man named Dominicano approach petitioner and say something to him, and then saw both men go upstairs.  Not long afterwards, Medrano heard commotion above and went upstairs and out to the parking lot to look.  There, he saw petitioner and Adillio in a fight and tried to intervene.  The next thing he knew, petitioner was pointing a gun toward Adillio; Medrano heard petitioner say, in substance, get away because I'm going to kill that guy, and then felt a bullet enter his chest.

2

Approximately 12 hours after the shooting, while in critical but stable condition at Nassau County Medical Center, Medrano spoke with Detective Stephen Firestone about the incident. He said he knew who had shot him and wrote down "Cuba" (petitioner's street name). He also told Firestone he had the shooter's phone number stored in his cell phone.[1]

Medrano identified petitioner in the courtroom as Cuba or El Cubano, confirmed that he had known petitioner for several months, and testified that they had a "good relationship" and were "friendly" with each other.

Medrano had been a police officer in El Salvador before coming to the United States in 2000. In response to defense questions, Medrano stated that he was aware of the existence of a Salvadoran gang, MS 13; that he believed that it was mostly Salvadorans who patronized the Vista Alegre deli; and that petitioner was probably its only Cuban customer.[2]

A second eyewitness to the shooting, Juan Cruz also positively identified petitioner as the shooter. (TT 237-248). Cruz recalled being in the basement when loud noises were heard from above. Accompanied by a group of other guests, Cruz went upstairs to investigate. Upon seeing petitioner in the parking lot with a gun, the others closed the door, leaving Cruz locked outside, with only petitioner, Medrano, and one other person.

According to Cruz, Medrano approached petitioner and said, in substance, what's going on, "and then [petitioner] shot him with the gun." Cruz then tried to go back inside but the door was still locked. A discrepancy between Cruz's and Medrano's accounts is that Cruz did not

---

[1] With this information and statements from others at the party who did not testify at trial, police located and apprehended petitioner two days after the shooting.

[2] Throughout his cross-examinations of prosecution witnesses, defense counsel sought to advance petitioner's claim that he, as a Cuban living among mostly Salvadorans, was being framed for a shooting committed by a local Salvadoran gang.

identify anyone at the scene as Adillio, but he confirmed the identity of the victim and the shooter:

> Q.     The person who got shot, I want to be clear, his name is Manuel Hernandez Medrano?
>
> A.     Yes, but I only know him as Manuelito.
>
> Q.     You saw the gun in [petitioner's] hand, this man's hand?
>
> A.     Yes.
>
> Q.     And he's the one who shot Manuelito?
>
> A.     Yes. (TT 240)

After the shooting and just before departing, petitioner said to Cruz, "What's with you?" Cruz responded, "Look, you already destroyed him.  What are you doing now, you might as well leave."  Cruz "remained there with this other person and the person that got shot" and then called 911.  He did not stay at the scene to speak with the police that night and testified at trial only because he was subpoenaed.

Detective Stephen Firestone, who reported to the scene, testified about the interviews he conducted in the initial hours after the shooting and the ensuing investigative steps that led to the apprehension of petitioner.  Of note, Firestone interviewed approximately eight witnesses in front of the Vista Alegre who told him they did not see the shooting but had been fleeing after hearing the gunshot. Firestone also interviewed Lisandro Perez, the owner of the Vista Alegre, who told him that although he did not see the shooting, he had witnessed petitioner in a verbal altercation with Adillio earlier that evening.[3]  Firestone added that Adillio was "not at the scene"

---

[3] Notably, when Lisandro Perez testified at trial, he was confronted, on cross examination, with a signed statement given to police in which he claimed he had witnessed a

4

and never interviewed because police "could not locate him" nor "find out his true identity." (TT 219).

Firestone also interviewed Mauricio Velazquez, who told him that he (Velazquez) was in the parking lot at the relevant time, saw petitioner shoot Medrano, and caught Medrano as he fell backwards from the blow.[4] Mauricio Perez, another interviewed party guest, told Firestone that he did not see the shooting but had had witnessed a verbal altercation between petitioner and Adillio earlier in the evening. (There was no hearsay objection; to the contrary, the details of what Velazquez and Perez said to Firestone were elicited on cross-examination).[5]

As for the drug charge, testimony came from Police Officer Michael Capobianco, one of the two officers who arrested petitioner two days after the shooting. (See TT 176-195). A pat-down search was conducted at the time of the felony car stop, and after petitioner was brought to a holding cell at the First Precinct, a second, more in-depth search occurred. Capobianco asked petitioner to remove his shoes and socks, but when petitioner did not turn his right sock completely inside out as instructed, Capobianco searched the sock and found a clear plastic bag

_____

fight between petitioner and *Medrano*, not Adillio, earlier in the evening. He then *denied* that that altercation had occurred, even in the face of his signed statement. His trial position was that it would have been his practice to have any guests involved in an altercation removed from the party.

[4] Velazquez did not testify at trial. Lisandro Perez, however, also testified that Velazquez was "holding [Medrano] in his arms" after Medrano was shot and that Velazquez told him (Perez) that petitioner was the shooter. (TT 166).

[5] Firestone also testified that he recovered several hours of video surveillance showing petitioner inside the deli during the party; he explained that he learned from deli owner Perez that the time indicator on the camera was early by six to eight hours, which meant the available footage placed petitioner inside the deli shortly after midnight. The deli's outdoor cameras were not operational on the night of the party.

with what proved to be cocaine.  A second bag was found in the left sock.  (TT 182-84). The combined weight of the two bags was just under a quarter of an ounce. (TT. 253).  In addition, Capobianco recovered $905.00 in cash from petitioner's pants pocket. (TT 182).

Petitioner took the stand in his own defense. (See TT 265-320).  He began by disclosing that he had a prior conviction for felony murder, that he had received a fifteen-year sentence for the crime, and that he had actually served a total of twenty-five years. (TT 267-69).  With respect to the shooting, petitioner admitted that he was at the Vista Alegre deli for the Christmas Eve party but denied that he shot Medrano, and claimed that he did not even see Medrano or Cruz there that night.  He testified that he did not get into any fights, that he was not present when the shooting occurred, and that matters were "nice and peaceful" when he left the party shortly after midnight.  (TT 301).

With respect to the drug charge, petitioner testified that he did not possess cocaine at the time of his arrest but was being framed by police.  He claimed that that the first time he saw the cocaine was when Detective Firestone entered the holding cell carrying it.  He claimed that Firestone said that he was going to make sure he went to jail for the drugs no matter what happened with the case.

As for the $905 he was carrying at the time of his arrest, petitioner testified that he had a steady job "working in . . .  water supply" and general maintenance for the Town of Ocean Beach on Fire Island that paid $12 per hour plus significant seasonal overtime, and that the Friday before his arrest he had received his biweekly pay of approximately $1400.  Because money had once been stolen from his room, he was in the habit of carrying his cash with him.

**B.      Cross-Examination of Petitioner**

Several lines of inquiry pursued during cross-examination of petitioner are the subject of the prosecutorial misconduct claim. The first line explored a possible drug-dealing rivalry as the motive for shooting the intended victim; petitioner says that casting him as a drug dealer unduly prejudicial in its own right and improper for the additional reason that he was charged only with the possession of cocaine, not its distribution.

The challenged remarks begin with the prosecutor asking petitioner whether it was true that "Adillio is a drug dealer in the Uniondale area," and whether petitioner "ha[d] a problem with Adillio because he [Adillio] was selling drugs in the neighborhood where you sell your drugs." (TT 311-312). Petitioner replied by asking, "Sell my drugs? . . . Who told you that I sell drugs," to which the prosecutor responded: "Do you want a list of people who told me?" (TT 312). The prosecutor then said, "I shouldn't say that, Judge, I'm sorry." (TT 312). Defense counsel did not object, and no curative instruction was requested or given. Later, the prosecutor returned to the subject, asking, "[s]o this $905 in cash . . . is hard earned money and not money that you made from selling drugs?" (TT 314). Defense counsel again did not object, and no curative instruction was requested or given.

The second challenged line of questions relates to petitioner's prior conviction. Petitioner complains that the questions improperly impeached his credibility *not* on the ground of the prior conviction but because he had invoked his constitutional right to a trial in that earlier matter. The following exchange occurred:

> Q.      Well, sir, you said before that you didn't want to be—I think the word
> you used was lie—you didn't want to lie or be dishonest or disingenuous
> to anybody, right?
>
> A.      Yes.

Q.     Well, isn't it a fact that when you were arrested on the homicide charge, you pled not guilty on that charge, didn't you?

A.     I did.

Q.     You went to trial on that case, right?

A.     Because I didn't shot [sic] no one.

Q.     You didn't shoot anyone but that wasn't the charge. You went in front of a jury of fourteen people, just like these good people, and proclaimed your innocence, did you not?

A.     I didn't testify in that—

Q.     You didn't testify there—

A.     —but no.

Q.     —but you certainly sat there and you went through a trial.  (TT 315-316).

Petitioner also cries foul at questions addressing the length of time he served on the prior conviction.  He asserts that the prosecutor's objective once again was to shift the jury's focus to uncharged conduct—in this context, by probing the fact that petitioner served twenty-five years on a fifteen-year sentence (the implication being that he committed additional crimes while in prison).  Petitioner singles out this exchange:

Q.     Those were your actions, that's what you did.

A.     That's correct and that's what I paid for.  That's what I was in jail for 25 year [sic].

Q.     You were actually sentenced to 15 years, weren't you?

A.     I did.

Q.     Yet you actually did 25?

A.     Twenty-five years.  (TT 317).

8

A third challenged line of inquiry involves petitioner's claim that he was being framed. Petitioner complains, inter alia, that the prosecutor asked him whether he was truly claiming that arresting officers who did not previously know him nevertheless chose to "fram[e]" him for cocaine possession (TT 319-320), and whether the witnesses who testified that he was the shooter were "dishonest" and "lying."  (TT 320). (To this last question counsel did interpose an objection, which the court sustained).

**C.      Summation**

Petitioner complains that, although there was no trial evidence about the seized cocaine's street value, the prosecutor pointed to the drugs during summation and said, "that's a lot of money right here in this package." (TT 338).  A second alleged impropriety relates to the number of witnesses.  The defense had sought to draw a favorable inference from the fact that of the many guests at the party, only two came forward and testified; refuting this point, the prosecutor argued:  "I'm sure [petitioner] was banking that they wouldn't [come forward], especially when his reputation is so well known in the community, a person who has already been convicted of murder. . . who now has a gun and shoots somebody in front of all these people." (TT 340). (There was no defense objection).  Petitioner says it was unduly prejudicial to suggest to the jury that he knew that his reputation as a killer would intimidate potential witnesses.

**D.      Sentencing**

Notwithstanding the verdict, at sentencing defense counsel re-asserted the trial claim that he was framed for a Salvadoran gang shooting.  The prosecutor argued that petitioner committed

perjury in that his trial testimony conflicted with an earlier, rejected plea.[6]  The court, imposing

the maximum sentence, noted "[petitioner's] prior conviction, the lack of remorse, his perjurious

testimony . . . and the serious nature" of his crimes.  (Sentencing Transcript 8.)

**E.    Petitioner's Direct Appeal**

Each of the grounds advanced in petitioner's habeas petition was raised and rejected by

the Appellate Division, Second Department on petitioner's direct appeal.  Treating severance

first, the appellate court agreed with petitioner that "the Supreme Court should have granted

[petitioner's] motion to sever the count charging criminal possession of a controlled substance in

the fourth degree from the remaining counts," but concluded that "the error was harmless, as the

evidence of [petitioner's] guilt was overwhelming, and there is no significant probability that the

error contributed to [petitioner's] convictions."  Masaguilar, 86 A.D.3d at 620.

Next, the appellate court concluded that the "challenges to the alleged instances of

prosecutorial misconduct at trial and in summation are unpreserved for appellate review."  Id.

The court proceeded to reach the merits in the alternative, concluding that, "[i]n any event,

although some of the prosecutor's questions and comments on cross-examination of [petitioner]

and in summation were improper, they constituted harmless error."  Id.   Finally, the appellate

court concluded that "[petitioner] was not deprived of the effective assistance of counsel."  Id.

Citing People v. Benevento, 91 N.Y.2d 708 (1998), the court reasoned that, "[c]onsidering the

_____

[6] The prosecutor reported that previously, when the matter was before a different judge,
petitioner pled guilty, but the plea was ultimately not accepted because petitioner's allocution
included assertions of self-defense.

totality of the evidence, the law, and the circumstances of the case, trial counsel provided meaningful representation." <u>Masaguilar</u>, 86 A.D.3d at 620.[7]

## DISCUSSION

## CONTROLLING LEGAL STANDARDS

### *A.  General Standard of Review*

A habeas corpus petition is not a vehicle for re-litigating every issue previously advanced in state criminal trial or appeal:  section 2254 relief is available only to a prisoner who can show that he is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254 (a).  When, in the attempt to make that showing, a prisoner advances claims that have already been adjudicated on the merits in state court, relief "shall not be granted . . . unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The Supreme Court has recognized that these standards "erect[] a formidable barrier to federal habeas relief," <u>Burt v. Titlow</u>, __ U.S.__, 134 S. Ct. 10, 16 (2013), but do so in furtherance of "a foundational principle of our federal system:  State courts are adequate forums for the vindication of federal rights . . . and are presumptively competent[] to adjudicate claims arising under the laws of the United States."  <u>Id.</u> at 15.

---

[7] Petitioner also moved for postconviction relief in the state court on the basis of compliance deficiencies at the Nassau County Police Department's crime laboratory, where the seized cocaine was tested.   That application was denied, <u>People v. Masaguilar</u>, Ind. # 705N-08 (County Ct. Nassau Co. Sept. 22, 2011) (Slip. Op.), as was leave to appeal that denial (by Decision and Order dated December 22, 2011 of the Appellate Division, Second Department).  The laboratory claim is not reasserted here on habeas.

The requirements of section 2254(d)(1) and (2) have been strictly construed: the "contrary to" and "unreasonable application" clauses of paragraph(d)(1) mean that, when advancing a claim of legal error, a federal habeas applicant must show that the state court, in rejecting his claim, either "directly contradict[ed] a holding of the Supreme Court," Evans. v. Fischer, 712 F.3d 125, 132 (2d Cir.) (internal quotation and citation omitted), cert. denied, __U.S. __, 134 S. Ct. 238 (2013), or seriously misapplied an explicitly on-point Supreme Court holding. Burt, 134 S. Ct. at 16 (prisoner must "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement") (internal quotation, citations and alterations omitted). For claims of "unreasonable determination[s] of the facts" under paragraph (d)(2), the prisoner bears the additional burden of "rebutting the state court's factual findings 'by clear and convincing evidence.'" Id. at 15 (quoting 28 U.S.C. § 2254(e)(1)).[8] The Supreme Court has made clear that, "[i]f this standard is difficult to meet—and it is—that is because it was meant to be," since federal courts "will not lightly conclude that a State's criminal justice system has experienced the extreme malfunction for which federal habeas relief is the remedy." Id. (internal quotations, citations and alterations omitted).

**B. Procedural Bar: Independent and Adequate State Law Ground**

In order "to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism," a

---

[8] The Supreme Court has twice declined to address the relationship between 2254(d)(2) and 2254(e)(1). Burt, 134 S. Ct. at 15; Wood v. Allen, 558 U.S. 290, 293 (2010). So, too, has the Second Circuit. Garguilo v. Heath, 586 Fed. App'x 764, 766 n. 1 (2d Cir. Oct. 10, 2014); Jones v. Murphy, 694 F.3d 225, 238 n. 4 (2d Cir. 2012), cert. denied, 133 S. Ct. 1247 (2013).

federal court "will not review the merits of claims . . . that a state court declined to hear because the petitioner failed to abide by a state procedural rule." Martinez v. Ryan, __ U.S. __, 132 S. Ct. 1309, 1316 (2012) (citing Coleman v. Thompson, 501 U.S. 722, 729) (federal courts must not review a question of federal law where the state court decision on that claim rests on an independent and adequate state law ground)). New York's preservation requirement is considered a firmly established and regularly followed rule sufficient to invoke the "independent and adequate state law ground" bar. Murden v. Artuz, 497 F.3d 178, 193 (2d Cir. 2007).

Notably, the bar applies "even where the state court has also ruled in the alternative on the merits of the federal claim." Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990). See also Harris v. Reed, 489 U.S. 255, 264 n. 10 (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding") (emphasis in original). Finally, when assessing the state court's reliance on a state law ground, as the Second Circuit has made clear, "[o]ur function . . . is not to reenact the proceeding or peer over the shoulder of the state court judge ruling on questions of state law. . . Instead . . . we are to determine only whether the state ruling falls within the state's usual practice and is justified by legitimate state interests, not whether the state court ruling was correct." Downs v. Lape, 657 F.3d 97, 101 (2d Cir. 2011) (internal quotations and citations omitted), cert. denied, 132 S. Ct. 2439 (2012).[9]

## C. Harmless Error on Federal Habeas

In Brecht v. Abrahamson, 507 U.S. 619 (1993), the Supreme Court held that in habeas proceedings, "the standard for determining whether a conviction must be set aside because of

---

[9] The "independent and adequate state ground" bar may be bypassed where a petitioner demonstrates "cause and actual prejudice" for failing to comply with the state rule, or that a lack of federal review will result in a fundamental miscarriage of justice. Harris v. Reed, 489 U.S. 255, 262 (1989); Wainwright v. Sykes, 433 U.S. 72, 87 (1977). No such claim is made here.

13

federal constitutional error" is whether that error "'had a substantial and injurious effect or influence in determining the jury's verdict.'" Brecht, 507 U.S. at 622 (quoting, Kotteakos v. United States, 328 U.S. 750, 776, (1946)). The Court rejected the former standard of Chapman v. California, 386 U.S. 18, 24 (1967)—which required reversal unless the state proved the error was harmless beyond a reasonable doubt—explaining that "[t]he *Kotteakos* harmless-error standard is better tailored to the nature and purpose of collateral review" and that "application of a less onerous harmless-error standard on habeas promotes the considerations underlying [the Court's] habeas jurisprudence." Id.

In Fry v. Pliler, 551 U.S. 112 (2007), the Court "h[e]ld that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in *Brecht* [ ] whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman* [ ]." Fry, 551 U.S. at 121-22. Accord Jackson v. Conway, 763 F.3d 115, 140-41 (2d Cir. 2014) (recognizing that Brecht standard applies in 2254 proceedings), cert. denied, 135 S. Ct. 1560 (Mar. 23, 2015).

**ANALYSIS OF PETITIONER'S CLAIMS**

*A.      Prosecutorial Misconduct*

Because the Appellate Division concluded that petitioner's allegations of prosecutorial misconduct were unpreserved for appellate review, Masaguilar, 86 A.D.3d at 620, they are, under the authorities reviewed above, procedurally barred from federal habeas review notwithstanding the appellate court's election to reach the merits in the alternative.

Were the allegations of misconduct *not* procedurally barred, however, the Court would still deny habeas relief on the ground that the Appellate Division's denial of relief was not

14

contrary to or an unreasonable application of controlling Supreme Court holdings,[10] nor factually

unreasonable within the meaning of Section 2254(d)(2).  Nevertheless, despite the Appellate

Division's view that the evidence of guilt was "overwhelming" (and its conclusion, therefore,

that the prosecutor's transgressions were harmless error), this Court must note its discomfort

with the manner in which the prosecution secured the conviction in this case.

Simply put, the fact that the allegations do not rise to the level of egregiousness triggering

habeas relief does not make the misconduct of which they complain a matter the Court can

overlook.  The prosecutor was out of line, plain and simple, and repeatedly: when he offered his

own hearsay testimony about what others supposedly told him (*i.e.*, that petitioner allegedly sold

drugs); when he pressed petitioner to characterize prosecution witnesses as liars—which

amounts to an impermissible shifting of the burden of proof; when he impugned petitioner's

credibility on the grounds that he had invoked his constitutional right to a trial in a prior criminal

matter; when he offered the suggestion that petitioner was "so well known in the community" as

a murderer as an explanation for the shortage of witnesses from the party; and, in general, for

having exploited the factually unrelated drug possession charge by making reckless insinuations

about drug dealing.  There was simply no evidence that petitioner was involved in the illegal

distribution of controlled substances and no excuse for the prosecutor's apparent effort to make

the jury think otherwise.

---

[10] See generally Darden v. Wainwright, 477 U.S. 168, 181 (1986) (for a claim of prosecutorial
misconduct to establish constitutional error, "it is not enough that the prosecutor's marks were
undesirable or even universally condemned. . . [rather, they must have] so infected the trial with
unfairness as to make the resulting conviction a denial of due process.") (internal quotations and
citation omitted).  Were any error established, Brecht and Fry would then govern the ensuing
harmlessness analysis.

As for the evidence of guilt, while there is no question as to sufficiency,[11] the Court is not comfortable characterizing the evidence as "overwhelming." Although "motive," as opposed to "intent," is not an element of attempted murder, the fact remains that the prosecution did not establish a motive for petitioner's shooting of the apparently intended victim, the mysterious Adillio—who, as noted, was never located and whose identity was never confirmed. Indeed, the prosecution conceded as much in summation. See TT 348-49 ("I can't tell you why [petitioner] wanted to kill Adillio. . . I don't know for a fact whether it was about drugs. I don't know whether it was about a debt."). Compounding this notable gap are the numerous evidentiary oddities alluded to in the trial review set forth above.[12] Ordinarily, of course, these are *not* features of a case that trigger comment from the habeas court; they do so here only because respondent has urged that the "overwhelming" evidence of guilt ought to result here, as it did in the Appellate Division, in a determination that any errors committed at trial were "harmless."

But Brecht does not require the evidence of guilt to be "overwhelming" in order for a federal habeas court to conclude that trial error was harmless and that grounds for the writ have not been established. The Court need only conclude, as it does, that the errors of which petitioner understandably complains did not have "a substantial and injurious effect or influence

---

[11] A rational jury could well have convicted by crediting the testimony of the victim (Medrano) and the other eyewitness (Cruz), notwithstanding the fact their accounts of what was said and who else was present in the parking lot do not match.

[12] For example, as noted, (i) Cruz was sure there were only three other individuals besides himself in the parking lot (petitioner, Medrano and another) but did not identify that other person either as Adillio or Velazquez, one or both of whom had to be present according to the accounts given by Medrano and Detective Firestone; (ii) Cruz did not describe a fight or altercation preceding the shooting; (iii) Velazquez did not testify yet his role as attendant to Medrano and witness to the crime came in through hearsay; and (iv) the relevant video footage bore unreliable time indicators.

in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 622 (internal citation and quotation omitted). The testimony of the survivor of a shooting is no doubt compelling to any jury, and on its basic claim that petitioner was the shooter, Medrano's account received corroboration from Cruz's. Also compelling, though for different reasons, is the testimony of the accused, also present in this case. The Court is confident, therefore, that the verdict here was the result of jurors' weighing of these compelling features of the trial rather than an unjust side effect of the prosecutor's aggressive tactics and rhetoric. Though the latter may well have had *some* effect, the Court cannot conclude, on this record, that any such effect was "substantial" enough to have "determin[ed]" the verdict within the meaning of <u>Brecht</u>. Indeed, in this Court's experience, blatant prosecutorial overstepping often tends to backfire, with most juries, through the exercise of their common sense and good judgment, displaying the capacity and willingness to see through it and arrive at their verdicts on the basis of the evidence. The prosecutorial misconduct claim, therefore, does not establish a basis for habeas relief.

## B.        *Failure to Sever*

Petitioner argues that there was no factual relationship between the drug and shooting-related charges sufficient to justify joinder under New York's Criminal Procedure Law §200.20(2)(a) and (b). He further claims that the prosecutor misled the lower court by asserting that the charges arose out of the same criminal transaction and that, if the charges were severed, the same officers would have to testify at both trials.[13]

---

[13] The Court has not been furnished with the severance motion papers. Petitioner relies, instead, on his state appellate brief, prepared by counsel, which both quotes from and paraphrases portions of the assistant district attorney's opposition affidavit. <u>See</u> ECF Doc. No. 1 at pp. 62-63.

These allegations do not state a violation of the constitution or federal law and so are not cognizable here. Estelle v. McGuire, 502 U.S. 62, 67–68 (1991) (reaffirming that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions").

In any event, as noted, the Appellate Division found that the Supreme Court should have granted the motion to sever but, again citing the overwhelming evidence of guilt and lack of any "significant probability" that the error contributed to the verdicts of guilt, Masaguilar, 86 A.D.3d at 620, concluded that the error was harmless.

Assuming arguendo that petitioner's claim triggered analysis under the constitutional test, see generally United States v. Lane, 474 U.S. 438, 446 n. 8 (1986) ("Improper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial."), the Court concludes, for the reasons already discussed in the context of the prosecutorial misconduct claim, that the requisite prejudice for habeas relief has not been established. This conclusion, however, does not diminish the Court's discomfort with the joinder of charges in this case. The presence of a quarter of an ounce of cocaine in petitioner's socks had absolutely nothing to do with the unfortunate events at the Vista Alegre holiday party two days earlier. The fortuity of their appearance in the same trial, however, inspired reckless prosecutorial insinuations about drug dealing completely lacking an evidentiary basis or other justification.

## C.     *Ineffective Assistance of Counsel*

To establish ineffective assistance of counsel at trial or on appeal, a criminal defendant must show that counsel's performance fell below an objective standard of reasonableness and

that the alleged deficiency affected the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984). Of course, "there is no reason for a court deciding an ineffective assistance claim . . . even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697

To prevail on such a claim in a federal habeas petition is especially difficult where, as here, the state court has rejected the ineffectiveness claim on the merits, because the applicant must overcome the double deference that Strickland and Section 2254(d) together require. See e.g., Cullen v. Pinholster, 131 S. Ct. 1388, 1403 (2011) ("review of [state court]'s decision is thus doubly deferential [because] [w]e take a highly deferential look at counsel's performance [under Strickland] through the deferential lens of § 2254(d)") (internal quotations and citations omitted).

Further, the fact that the state appellate court deciding the ineffectiveness claim applies New York rather than federal constitutional law—as is the case here, where the Appellate Division cites People v. Benevento, 91 N.Y.2d 708 (1998), rather than Strickland—does not, standing alone, give rise to a "contrary to" or "unreasonable application of" Strickland claim. See generally Cummings v. LaValley, 582 Fed. Appx. 49, 50 (2d Cir. Nov. 7, 2014); Rosario v. Ercole, 601 F.3d 118, 124 (2d Cir. 2010). Indeed, the New York standard "is understood to subsume the federal standard because it is considered more protective of criminal defendants." Cummings, 582 Fed. Appx. at 50. Therefore, "properly applied," the New York standard is "not

contrary to *Strickland*." Rosario, 601 F.3d at 124. N Thus, "a New York state court is not required to decide a case 'in *Strickland* terminology' in order to conform with the federal standard." Cummings, 582 Fed. Appx. at 50 (quoting Rosario, 601 F.3d at 127).

Petitioner's ineffectiveness allegations essentially derive from his prosecutorial misconduct claim—*i.e.*, he asserts that his lawyer should have done something more to fend off the various prosecutorial improprieties already discussed—and for this reason, they are no more a basis for habeas relief than the prosecutorial misconduct claim. In short, the lack of prejudice finding inherent in the Court's rejection of the prosecutorial misconduct claim (above) disposes of the prejudice inquiry under Strickland and, thus, of any claim that the Appellate Division's rejection of petitioner's ineffectiveness claim could be read as contrary to or an unreasonable application of Strickland for section 2254 purposes.[14]

## CONCLUSION

As discussed, the Court remains disturbed by the tactics and rhetoric exhibited by the prosecutor in this case, which crossed the line from aggressive to reckless and inappropriate. The Court is likewise uncomfortable with the improper joinder of the shooting-related charges with a wholly unrelated drug possession charge, which the prosecutor exploited irresponsibly. But the evidence of guilt is compelling and the requisite constitutional prejudice has not been shown. For all the reasons discussed, therefore, Orlando Masaguilar's application for relief

_____

[14] The one stray allegation not premised on the prosecutorial misconduct allegations is that counsel was ineffective for failing to object to Detective Firestone's hearsay testimony that the surveillance camera's timer was several hours early. Petitioner cannot show he was prejudiced because he admitted he was at the party at roughly the hours claimed to be depicted on the footage.

under 28 U.S.C. § 2254 is denied in its entirety.  Further, because Masaguilar has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability will not issue.

SO ORDERED.

Dated: Brooklyn, New York
      August 4, 2015

/s/ Judge Raymond J. Dearie
_____
RAYMOND J. DEARIE
United States District Judge